UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| SHEILA DENISE RICE, | ) |
| | ) |
| Plaintiff, | ) |
| | ) No. 17 C 1193 |
| v. | ) |
| | ) Magistrate Judge Sidney I. Schenkier |
| NANCY A. BERRYHILL, Acting | ) |
| Commissioner of Social Security, | ) |
| | ) |
| Defendant. | ) |

## MEMORANDUM OPINION AND ORDER[1]

Plaintiff, Sheila Denise Rice, seeks reversal and remand of the final decision of the Acting Commissioner of Social Security ("Commissioner") denying her application for Social Security benefits (doc. # 12: Pl.'s Mot. for Summ. J.). After a hearing, an administrative law judge ("ALJ") denied Ms. Rice's application for benefits, and the Appeals Council denied her request for review of that decision, making the ALJ's decision the final decision of the Commissioner (R. 1). The Commissioner has filed a cross-motion asking the Court to affirm the ALJ's decision (doc. # 14: Def.'s Mot. for Summ. J.). For the reasons that follow, we grant Ms. Rice's motion.

### I.

Ms. Rice has been depressed most of her life (*see, e.g.*, R. 579, 601, 663). She was treated for depression as early as 1994, and has taken anti-depressant medications since 2011 (R. 476-77). From 1990 through July 2013, Ms. Rice worked full-time as an administrative assistant for Luster Products ("Luster") (R. 54), but testified that she stopped working in July 2013 because

---

[1]On March 14, 2017, by consent of the parties and pursuant to 28 U.S.C. § 636(c) and Local Rule 73.1, this case was assigned to the Court for all proceedings, including entry of final judgment (doc. # 9).

her depression worsened to the point she became overwhelmed and was unable to control her frequent bouts of crying (R. 57-58, 62-63; *see also* R. 601, 607).

Ms. Rice's application for Social Security disability benefits alleged that she became disabled on July 31, 2013, due to breast cancer, anxiety, depression, thyroid disorder, high blood pressure, tendonitis and osteoporosis (R. 110-11). The day before, July 30, 2013, psychiatrist, Filogonio Moises Gaviria, M.D., conducted an IOP (intensive outpatient program) intake evaluation of Ms. Rice (R. 425). Dr. Gaviria noted Ms. Rice had been in the hospital for a week before her insurance approved her for IOP treatment (*Id.*). He observed that Ms. Rice "appear[ed] glum, listless, irritable, distracted" and "severely depressed," and he diagnosed her with major depression and mixed personality disorder (R. 425-26). Dr. Gaviria prescribed Ms. Rice two antidepressants, Effexor and citalopram (R. 426). On February 28, 2014, Dr. Gaviria filled out a mental capacity assessment that diagnosed Ms. Rice with major depressive disorder,[2] and -- via checked boxes -- opined that she had moderate to marked limitations in understanding and memory, marked to extreme limitations in sustained adaptation, concentration and persistence, and moderate to extreme limitations in social interaction (R. 503-05).

On December 11, 2013, Ms. Rice was evaluated by Ericka Swanson, Psy.D., for the Department of Disability Services ("DDS") (R. 475). Dr. Swanson observed Ms. Rice had poor eye contact and was tearful throughout the meeting (R. 475, 478). She diagnosed Ms. Rice with major depressive disorder, moderate without psychotic features and assigned her a Global Assessment Functioning ("GAF") score of 43 (R. 479).[3]

---

[2]Dr. Gaviria listed 296.32, the code used in DSM-IV for major depressive disorder, recurrent episode, moderate.

[3]"The GAF is a 100–point metric used to rate overall psychological, social, and occupational functioning, with lower scores corresponding to lower functioning." *Lanigan v. Berryhill*, 865 F.3d 558, 561 n.1 (7th Cir. 2017) (citing American Psych. Assoc., Diagn. & Stat. Man. of Mental Disorders 34 (4th Ed., Rev. 2000) ("DSM-IV")). Scores between 41 and 50 indicate the individual has "serious difficulty." *Gerstner v. Berryhill*, 879 F.3d 257, 263

On May 9, 2014, Ms. Rice visited her primary care physician, Mohammad Shamshuddin, M.D., for follow-up after she was seen at urgent care for agitation and an anxiety attack (R. 540). He observed Ms. Rice had a depressed affect, was anxious, and complained of palpitations and dizziness (R. 542-44). Dr. Shamshuddin prescribed an additional antidepressant, sertraline (*Id.*).

On September 22, 2014, Ms. Rice was admitted to Ingalls Memorial Hospital because she had thoughts of killing herself and was assessed as a high risk of harm to herself or others (R. 665, 668-70). She was tearful and depressed, with poor judgment, insight and impulse control, and she was assessed a GAF score of 30 (R. 663, 668-70).[4] Ms. Rice reported that her mood had been worsening for four to five weeks, since she "weaned" herself off mental health medications after she lost her insurance and could no longer afford to see Dr. Gaviria or purchase her medications (R. 678, 663, 681). Intake notes described some of Ms. Rice's behavior as "manic[]," including buying two guitars and a keyboard, tearing wood off her front porch, moving a 400 pound couch outside her house, cutting off all her hair, and getting a facelift in January 2014 (R. 665-66). Her primary diagnosis was major depression, secondary to drug abuse (she tested positive for opioids and cannabis) (R. 677-79). While in the hospital, Ms. Rice was given citalopram and lamotrigine (an anticonvulsant used to treat bipolar disorder) (R. 679). At discharge on September 27, 2014, her GAF score was 50, she was feeling less hopeless and helpless and sleeping and eating better, but she still had a depressed mood and affect (R. 682).

On October 1, 2014 Ms. Rice began outpatient mental health treatment at Sertoma Centre ("Sertoma") for severe major depressive disorder (R. 583-85). Her GAF during that month was

---

(7th Cir. 2018). The DSM-V, issued in 2013, is the latest version of the Diagnostic and Statistical Manual of Mental Disorders; in it the American Psychiatric Association eliminated use of the GAF system. *Id.* at 263 n.1.

[4] A GAF score of 31 to 40 reflects "[s]ome impairment in reality testing or communication (e.g., speech is at times illogical, obscure, or irrelevant) OR major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood (e.g., depressed man avoids friends, neglects family, and is unable to work)." *Lanigan*, 865 F.3d at 561.

3

consistently assessed at 40 (*see, e.g.*, R. 607, 624). At her appointment on October 8, 2014, Ms. Rice reported that she felt out of control of her emotions; she described having crying spells, feelings of hopelessness and worthlessness, fatigue, difficulty sleeping, low motivation, difficulty concentrating, and depression so bad that she often had difficulty getting out of bed (R. 610-11). On October 13, 2014, Ms. Rice said her "stress has been especially overwhelming and difficult to manage in the last few years;" she "kept it pretty much under control at work until last year" when she could no longer "deal with confrontations" and "would get upset easily at work during meetings, would leave and cry" (R. 601).

On October 24, 2014, J.B. Goebel, Ph.D., conducted a mental status evaluation of Ms. Rice for DDS, at which Ms. Rice was tearful and had poor eye contact (R. 579-80). Dr. Goebel diagnosed her with major depressive disorder and opined Ms. Rice was mildly impaired in understanding and memory, moderately impaired in her ability to sustain persistence and concentration, and not limited in her ability to interact and adapt socially (R. 581). On November 4, 2014, DDS consultant, Russell Taylor, Ph.D., opined based on the medical record that Ms. Rice had severe affective and anxiety disorders, resulting in moderate impairment in concentration, persistence, and pace; mild restriction in activities of daily living ("ADLs") and social functioning, and no repeated episodes of decompensation (R. 127-29, 132-33).

Ms. Rice continued receiving therapy at Sertoma over the next few months. In November 2014, she was depressed and tearful, and her GAF score was 40 (R. 590, 713). In December, Ms. Rice reported struggling with feelings of sadness after attending church for the first time in months, but later that month, she began to feel less depressed and expressed the desire to work again so she could provide for herself (R. 717, 721, 725). On January 6, 2015, however, Ms.

4

Rice reported feeling mistreated and left out by her family over the holidays (R. 731), and the next week, she was "almost immediately depressed and in tears during [the] meeting" (R. 739).

On January 21, 2015, Ms. Rice walked into Ingalls hospital, presenting as stressed, tearful and anxious, and complaining of headaches; she was discharged with a prescription for Alprazolam (a sedative) (R.648, 650, 654). The next day, Ms. Rice returned to Sertoma. She was tearful and stressed, but she wanted to start working as a caregiver for her mother to earn money (R. 747, 751). On January 29, 2015, Ms. Rice reported feeling less depressed, and in February, despite remaining a bit depressed and stressed, Ms. Rice was working at her mother's house and applying for other jobs (R. 753-57). On February 26, 2015, however, she was stressed because she had taken on three caregiver jobs and had been fighting with her mother (R. 761).

On March 5, 2015, Ms. Rice cried throughout her session at Sertoma because she was frustrated with her job search and felt she was getting "old and tired;" she became guarded and defensive and left her session abruptly (R. 763). On March 12, 2015, Ms. Rice was again tearful, and she became angry at her therapist and walked out of the session (R. 769). Ms. Rice did not return to Sertoma; between March 26 and June 8, 2015, she informed staff by phone that she was unable to meet because she had job interviews and appointments and was too busy working (R. 772-74, 795). Ms. Rice also said she felt better emotionally and no longer needed services (*Id.*).

Ms. Rice did not receive mental health therapy over the next year, but notes from her rheumatologist during that time listed citalopram and Effexor among her medications (R. 819-34). A report from her gynecologist on June 17, 2015, also stated that Ms. Rice was on multiple antidepressants and made a referral for her to re-establish psychiatric care (R. 873). In addition, on September 15, 2015, Ms. Rice was kept overnight at Ingalls hospital for observation after she complained of chest pain. Cardiac testing was unremarkable, but she appeared anxious,

5

depressed and tearful, and a recommendation was made for her to change her dosages of citalopram and Effexor (R. 897, 927, 940-41, 1063, 1068).

On February 24, 2016, Ms. Rice had an appointment with a gynecologist and primary care doctor. She was anxious and tearful during her appointments, and both physicians recommended Ms. Rice seek psychotherapy (R. 703-04, 862-67). The primary care physician prescribed clonazepam, a sedative used to treat anxiety and panic disorder, in addition to citalopram and Effexor (R. 704).[5]

## II.

On May 6, 2016, at the hearing before the ALJ, Ms. Rice testified that after leaving her job in July 2013, she received residual payments and unemployment benefits that enabled her to purchase out-of-pocket medical insurance through the end of 2014 (R. 59, 68). When her insurance ran out, she turned to Medicaid, and Dr. Shamshuddin took over writing her prescriptions for antidepressants (R. 69). Ms. Rice testified that financial pressures led her to stop taking her anti-depressants because she thought they were interfering with her ability to think clearly and find a job; however, she restarted her medication after ending up hospitalized (R. 75-77). Ms. Rice also received therapy, but she stated that she stopped going because the counselors at Sertoma were too young to give her the support she needed (R. 72-73). She testified that she looked for counseling elsewhere but did not find a good fit, so "Dr. Shamshuddin did everything [she] couldn't get any other doctor to take care of" (R. 73-74).

Ms. Rice testified that to earn money, she started working three days a week, three hours a day helping her mother make the bed, fold clothes, wash dishes, bathe and shop (R. 59-60). In

---

[5]From April through August 2016, Ms. Rice attended weekly mental health treatment at Steppin Stone Therapy. Her therapist's notes frequently indicated Ms. Rice appeared tearful, guarded and withdrawn, overly anxious, stressed, moody, and severely depressed (R. 1190, 1203-12). Treatment records from Steppin were added to the record after the date of the ALJ's decision (R. 17).

6

2015, Ms. Rice got her substitute teacher certificate and began working as a substitute; she testified that she cried sometimes at work (R. 60, 65). At the time of the hearing, she was working part-time as an aide to a special needs sixth grader; work was difficult and challenging for her, but it gave her self-worth (R. 71). Ms. Rice was unsure whether she could work full-time (*compare* R. 64 (testifying she could not work full-time) *with* R. 84-85 (testifying that she could perform her current position full-time)).

The ALJ presented the vocational expert ("VE") with several hypotheticals with various physical and mental limitations (R. 90-109). The VE testified that Ms. Rice's past work as an administrative assistant would not be available if she was limited to simple, routine tasks, but other positions would be available (R. 94). No jobs would be available if she could not take redirection from a supervisor, or would be off-task more than 15 percent of the workday or absent more than twice per month (R. 92, 105).

### III.

On August 17, 2016, the ALJ issued a written decision concluding that Ms. Rice was not disabled from her alleged onset date of July 31, 2013 through the date of the decision (R. 33). At Step 1, the ALJ determined that Ms. Rice has not engaged in substantial gainful activity during that time; in 2014, she earned $11,569.08, and in 2015, she earned $8,755.56, both below the yearly substantial gainful activity level (R. 19).

At Step 2, the ALJ determined Ms. Rice had the severe impairments of degenerative changes of the back and neck, tendonitis and arthritis, but that her mental impairment of depression was not severe (R. 19-20). The ALJ found Ms. Rice had mild limitations in ADLs and social functioning because she drives, cooks, does housework and laundry, works as an aide for a special needs student, has performed caretaker jobs, and participates in her church choir (R.

7

21-22). The ALJ determined Ms. Rice also had mild limitations in concentration, persistence or pace because although she testified that her depression, crying spells, and medication impaired her concentration and memory, she testified she could work full-time as an aide, and Dr. Swanson's examination showed Ms. Rice could perform serial sevens and repeat a series of five numbers (R. 22). The ALJ found no episodes of decompensation of extended duration (*Id.*).

The ALJ then reviewed the medical record. She took note of Ms. Rice's hospitalization for depression at the beginning of her onset date and her hospitalization in September 2014 due to "mood disorder and cannabis abuse" (R. 23-24). The ALJ also looked at Dr. Swanson's report; the ALJ gave "no weight" to the assigned GAF score of 43 because it was "based on a one-time evaluation of mainly the claimant's subjective complaints that are not supported by the other objective evidence of record" (R. 23). The ALJ also gave "no weight" to Dr. Gaviria's mental capacity assessment because he "just completed a check the box form without any supporting evidence [that he] evaluated the claimant in person or reviewed any of the medical evidence in the file," and the ALJ found it "not consistent with the objective evidence of record" (R. 24). The ALJ gave Dr. Goebel's opinion "some weight," concluding that "the other objective evidence of record does not support a moderate limitation in concentration, persistence or pace," as found by Dr. Goebel (*Id.*). The ALJ gave "minimal weight" to the opinion of Dr. Taylor, who agreed with Dr. Goebel that Ms. Rice had moderate restrictions in concentration, persistence or pace (R. 24-25). The ALJ also noted that Ms. Rice received services form Sertoma for six months, and pointed out the report from April 2015 in which Ms. Rice reported that mentally she was feeling better and she did not believe she needed counseling (R. 25).

Overall, the ALJ concluded that "the evidence does not generally support the claimant's allegations" (R. 27). The ALJ stated that "many mental status examinations of record indicate

8

that the claimant was alert, cooperative, [and] oriented to person, place, current date and time" and had "normal" appearance, behavior, mood, affect, attention span and concentration (R. 25). In addition, the ALJ stated that despite Ms. Rice's claim that she suffered from depression all her life, she "has been able to work above the substantial gainful activity level" for many of those years (*Id.*). The ALJ also noted that although Ms. Rice reported being at times unable to afford medical care, "she could afford to drink alcohol occasionally and [] smoke marijuana" (*Id.*). The ALJ also determined that Ms. Rice was "not compliant with mental health medications" (R. 28).

Ultimately, the ALJ determined that the mild limitations in the Paragraph B criteria identified at Step 2 did not warrant any non-exertional mental limitations in Ms. Rice's RFC (R. 26, 31). The ALJ concluded that Ms. Rice was not disabled because she could perform her past relevant work as an administrative assistant; alternatively, the ALJ found that Ms. Rice could perform other work with transferable skills (R. 32-33).

## IV.

Our review of the ALJ's decision "is deferential; we will not reweigh the evidence or substitute our judgment for that of the ALJ." *Summers v. Berryhill*, 864 F.3d 523, 526 (7th Cir. 2017). "We will uphold that decision if it is supported by substantial evidence in the record," *Lanigan v. Berryhill*, 865 F.3d 558, 563 (7th Cir. 2017), which means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Schloesser v. Berryhill*, 870 F.3d 712, 717 (7th Cir. 2017). "An ALJ need not address every piece of evidence, but [she] must establish a logical connection between the evidence and [her] conclusion," *i.e.*, "build an accurate and logical bridge" between the evidence and her conclusion. *Lanigan*, 865 F.3d at 563.

Ms. Rice primarily argues that the ALJ erred in assessing her mental impairments as non-severe and failing to assess any mental limitations in her RFC (doc. # 13: Pl.'s Mem. in Supp. of Summ. J. at 1). We agree.

### A.

The Step 2 determination of severity is "a *de minimis* screening for groundless claims intended to exclude slight abnormalities that only minimally impact a claimant's basic activities." *O'Connor-Spinner v. Colvin*, 832 F.3d 690, 697 (7th Cir. 2016) (internal quotations omitted). In *O'Connor-Spinner*, the Seventh Circuit held that an ALJ's determination that a diagnosis of major depression was not severe was "nonsensical given that the diagnosis [of major depression], by definition, reflects a practitioner's assessment that the patient suffers from 'clinically significant distress or impairment in social, occupational, or other important areas of functioning.'" *Id.* (quoting DSM-IV at 356). Here, as we explain below, the ALJ's Step 2 determination that Ms. Rice's major depression was not severe was not a harmless screening error, but an error that necessitates remand because the ALJ did not include any mental limitations in the RFC.

### B.

The ALJ stated that "many mental status examinations of record indicate that the claimant was alert, cooperative, [and] oriented to person, place, current date and time" and had "normal" appearance, behavior, mood, affect, attention span and concentration (R. 25). This conclusion is not supported by substantial evidence, because it rests on cherry-picked evidence of Ms. Rice's mental health treatment. It is well settled that "[a]n ALJ cannot recite only the evidence that supports his conclusion while ignoring contrary evidence. This cherry-picking is

especially problematic where mental illness is at issue, for a person who suffers from a mental illness will have better days and worse days, so a snapshot of any single moment says little about [her] overall condition." *Meuser v. Colvin*, 838 F.3d 905, 912 (7th Cir. 2016) (internal citations and quotations omitted). In this case, the ALJ ignored significant evidence of record that could put her cherry-picked assessment of Ms. Rice's mental health record in a different light.

*First*, despite evidence that Ms. Rice was repeatedly tearful, anxious and/or depressed during her six months of mental health treatment at Sertoma, the ALJ cited only a report from the end of Ms. Rice's treatment there where she reported that she was feeling better and did not think she needed counseling (R. 25). In so doing, the ALJ ignored evidence that her physicians continued to prescribe mental health medications and recommend that Ms. Rice receive mental health treatment. *Second*, the ALJ seized on a few positive findings in Dr. Swanson's mental health examination, but ignored Dr. Swanson's observation that Ms. Rice was very tearful and had poor eye contact and her opinion that Ms. Rice had a GAF score of 43, indicating major impairment.[6] *Third*, the ALJ stated that the record showed Ms. Rice was "not compliant with mental health medications," presumably because Ms. Rice at one point attempted to wean herself off them. However, the ALJ ignored the fact that after one month off her medications, Ms. Rice ended up hospitalized with severe mental health symptoms and subsequently restarted her medications. In sum, the ALJ improperly "considered only the signs of possible improvements in [the medical] notes and ignored the negative findings." *Gerstner v. Berryhill*, 879 F.3d 257, 262 (7th Cir. 2018).

---

[6]The ALJ also erred by ignoring GAF assessments by other medical professionals in the record. Although the DSM-V "has abandoned the GAF, [] the Social Security Administration still instructs ALJs to treat GAF scores as medical-opinion evidence." *Gerstner*, 879 F.3d at 263 n.1. That error is significant here, because while a potential weakness in GAF assessments is that they reflect a snapshot at one given time, in this case Ms. Rice had multiple GAF assessments done over an extended period of time by several different doctors, and each of those doctors opined that Ms. Rice suffered from serious mental health difficulties (*see supra* pp. 2-3).

## C.

The ALJ also improperly rejected the opinion of and ignored the treatment Ms. Rice received from Dr. Gaviria. The ALJ stated that she gave "no weight" to Dr. Gaviria's February 28, 2014, assessment because he "just completed a check the box form without any supporting evidence [that he] evaluated the claimant in person or reviewed any of the medical evidence in the file," and the ALJ found it "not consistent with the objective evidence of record" (R. 24).

The ALJ's conclusion ignores that Ms. Rice had received treatment from Dr. Gaviria since July 30, 2013, when she began intensive outpatient therapy for severe stress-related depression and anxiety (R. 233). In addition, "[a]lthough by itself a check-box form might be weak evidence, the form takes on greater significance when it is supported by medical records." *Larson v. Astrue*, 615 F.3d 744, 751 (7th Cir. 2010). Although the form Dr. Gaviria filled out did not cite to specific examination results, contrary to the ALJ's statement, the form was consistent with Dr. Gaviria's examination findings and treatment records from July and August 2013. *See Cullinan v. Berryhill*, 878 F.3d 598, 605 (7th Cir. 2017) (treating physician's opinion of the claimant's limitations, "contrary to what the ALJ said, was not inconsistent with his own treatment notes, so the ALJ should not have ignored it"). Moreover, contrary to the ALJ's conclusion, Dr. Gaviria's findings were consistent with other evidence of record, including Ms. Rice's inpatient hospital stay in September 2014. *See Gerstner*, 879 F.3d at 261-62 (holding that the ALJ erred by "overlook[ing] the extent to which [the treating physician's] opinions were consistent with the diagnoses and opinions of other medical sources who treated [the claimant]").

## D.

In addition to giving no weight to Dr. Gaviria's opinion, which found moderate to marked mental limitations, the ALJ rejected the portions of Dr. Goebel's and Dr. Taylor's

opinions that determined Ms. Rice had moderate restrictions in concentration, persistence or pace. The ALJ instead determined that Ms. Rice had only mild limitations in concentration, persistence or pace and no related functional limitations in her RFC.

In other words, "[r]ather than relying on the guidance of professionals and evidence from [the claimant's] treating sources, the ALJ 'played doctor' by substituting h[er] opinion for their medical judgment." *O'Connor-Spinner*, 832 F.3d at 697. The ALJ's statement that "the other objective evidence of record does not support a moderate limitation" is not supported by substantial evidence, as each medical professional -- whether treating, examining, or consultative -- who opined on Ms. Rice's concentration, persistence or pace found more than mild limitations. Even though the ALJ "excluded depression at Step 2 . . . at the very least, the ALJ was compelled . . . to account for [the claimant's] limitation on concentration, persistence, and pace and also to address—not ignore—[the physicians'] opinion[s] that she is moderately limited in responding appropriately to supervisors." *O'Connor-Spinner*, 832 F.3d at 698.

### E.

Finally, we note that Ms. Rice's work history did not justify the ALJ's decision to ignore the above evidence of Ms. Rice's mental health impairments. The ALJ noted that Ms. Rice said that she suffered from depression for many years, but her "work history show[ed] [she] ha[d] been able to work above the substantial gainful activity level" for many of those years. However, the ALJ cited to no evidence (and we are aware of none) that mental health conditions are static. Ms. Rice has consistently reported to her physicians and testified at her hearing that her depression worsened to the point that, on or about her alleged onset date, she could no longer work due to her mental impairments. "On [the ALJ's] logic, a person suffering from an impairment that has not become disabling must act and seek treatment as if the condition is

disabling or else run the risk that any future assertion that the impairment has worsened will be viewed as a lie." *Shauger v. Astrue*, 675 F.3d 690, 697 (7th Cir. 2012). To the contrary, "even persons who are disabled sometimes cope with their impairments and continue working long after they might have been entitled to benefits," until their condition has worsened to the point they can no longer work. *Goins v. Colvin*, 764 F.3d 677, 679 (7th Cir. 2014) (quoting *Shauger*, 675 F.3d at 697).

## CONCLUSION

For the foregoing reasons, we grant Ms. Rice's motion for remand (doc. # 12) and deny the Commissioner's motion to affirm (doc. # 14). This case is remanded for further proceedings consistent with this opinion. The case is terminated.[7]

ENTER:

Sidney I. Schenkier
United States Magistrate Judge

**Dated: May 2, 2018**

---

[7]Because we remand on the above grounds, we do not reach plaintiff's final argument, that the ALJ's Steps 4 and 5 determinations are not supported by substantial evidence.